# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### NORTHEASTERN DIVISION

| | | |
|---|---|---|
| RONALD BERT SMITH, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| vs. | ) | 5:05-cv-1547-LSC-JEO |
| | ) | |
| DONAL CAMPBELL, Commissioner, | ) | |
| Alabama Department of Corrections, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OF OPINION

This case involves a petition for writ of habeas corpus filed on behalf of Ronald Bert Smith (hereinafter "Smith" or "the petitioner") who was sentenced to death following his conviction of capital murder in Madison County, Alabama. (Doc. 1).[1] Presently before the court is Respondent's Motion to Dismiss Habeas Petition as Untimely. (Doc. 13). Upon consideration of the motion, the court finds that it is due to be granted.

## I. BACKGROUND

### A. Offense Conduct

Between three and four a.m. on November 8, 1994, Ronald Bert Smith, Jr., Jay Zuercher, and Chad Roundtree were riding in a vehicle when they decided to rob a Circle C convenience store in Huntsville, Alabama. (Vol. 26, R-63 at 1-5).[2] They parked the vehicle behind the store

---

[1] References to "Doc. ____" are to the document number assigned by the Clerk of the Court.

[2] For purposes of this Memorandum Opinion, the court will adopt Respondent's method of citation to the record. The multi-volume State Court record is located at document 11 in this Court's record. The "Tab R- __" references are to the tabs attached to the State Court record by Respondent.

and Smith went inside.  (*Id*. at 1-2).  Many of the following events were caught on videotape by cameras in the store and that videotape was recovered and used as an exhibit at trial.  (*Id*. at 2 n.5).  Once inside, Smith pulled a gun on Casey Wilson, the lone clerk, and asked Wilson to open the register.  (*Id*. at 2).  When the register would not open, Smith forced Wilson into the restroom, pistol-whipped him, and shot him in the left arm.  (*Id*. at 2-3).  Leaving Wilson in the restroom, Smith then returned to the cash register where he tried to gain access.  (*Id*. at 4).  Unsuccessful, he then looked under the counter where the safe was located and appeared to manipulate the safe's combination lock.  (*Id*.).

Smith then returned to the restroom where Wilson was located and apparently fired the killing shot into Wilson's head.  (*Id*.).  Smith then retrieved spent shell casings from the floor and stepped out of the restroom.  Zuercher, also in the store by this time, stole a pack of cigarettes. Smith and Zuercher then exited the store.  Before leaving the premises, however, someone remembered that the store had security cameras and Smith ran back into the store twice, ultimately using his gun to gain access to the store's videocassette recorder.  (*Id*. at 4-5).  Smith took the recorder and tape and the three accomplices drove away.  (*Id*.).

**B.  State Court Proceedings**

The petitioner was convicted of capital murder on August 5, 1995, in Madison County, Alabama.  A penalty hearing followed and the jury, by a vote of 7-5, recommended that he be sentenced to life without parole.  (Vol. 12 at 1620 (Tab R-28)). The trial court overrode the jury's recommendation, and on October 6, 1995, the trial court judge[3] sentenced Smith to death.  A

---

[3] Madison County Circuit Court Judge C. Lynwood Smith, Jr., presided over the guilt and penalty phases of trial.

timely motion for new trial was filed, and a hearing was held on May 23, 1996.  (*See generally* Vol. 12).  On June 4, 1996, the post-conviction trial judge[4] denied the motion for new trial.  (*Id.* at 45-46).

Smith appealed his conviction and sentence to the Alabama Court of Criminal Appeals.[5] On April 3, 1998, that court entered a published opinion affirming Smith's conviction and death sentence.  *See Smith v. State*, 756 So. 2d 892 (Ala. Crim. App. 1998).  The Supreme Court of Alabama affirmed the conviction and sentence on January 21, 2000, finding no reversible error, plain or otherwise.  *See Ex parte Smith*, 756 So. 2d 957 (Ala. 2000).

On September 27, 2001, Smith filed a petition for relief from judgment pursuant to Rule 32 of the Alabama Rules of Criminal Procedure.  (*See* Vol. 20, Tab. R-46).  However, the petition was not accompanied by an *in forma pauperis* declaration and prison account certification.  The filing fee was paid in full on February 6, 2002, the petition was deemed filed on that date, and Respondent was directed to answer the petition.  (*Id.* at 1, 3 & 164).  An evidentiary hearing was held on February 14, 2003.  (*See* Vol. 24).  The petition was denied by the trial court in a lengthy opinion on May 8, 2003.  (*See* Vol. 23 at 616-826).

On June 13, 2003, Smith filed a Notice of Appeal.  On April 22, 2005, the Alabama Court of Criminal Appeals affirmed the trial court's decision in an unpublished opinion.  *Smith v. State*, memo. op.  CR-02-1691, ___So. 2d ___ (Ala. Crim. App. 2005).  On July 15, 1995, the

---

[4] Madison County Circuit Court Judge Bruce E.Williams presided over the motion for new trial and also the Rule 32 proceedings that eventually followed.

[5] On December 23, 1997, the Alabama Court of Criminal Appeals remanded the case to the circuit court for a hearing on two (2) issues, neither of which are pertinent to the habeas petition.

Supreme Court of Alabama denied certiorari review.

**C. The Present Habeas Petition**

On July 19, 2005, Smith filed the present petition.  On December 5, 2005, Smith filed an amended petition in which he raises numerous constitutional claims for relief, including for the first time, allegations involving newly discovered evidence.  (Doc. 6).

Respondent filed a motion to dismiss the habeas petition as untimely, arguing that the petition was not filed within one (1) year of the date Smith's case became final on direct appeal.  (Doc. 13, pp. 1-4) (citing 28 U.S.C. § 2244(d)(1) (also known as the Anti-Terrorism and Effective Death Penalty Act ("AEDPA")).  Thereafter, Smith and Respondent filed several opposing motions, responses and replies, all of which pertain to the timeliness of Smith's habeas petition.[6]

**1. Respondent's Motion**

Respondent initially moved this court to dismiss the petition as untimely on the basis that Smith "filed his petition well past the one-year limitation period" of AEDPA.  (Doc. 13 at 1).  Although there are four possible dates that can be used to calculate the one-year statute of limitation, Respondent declares only § 2244(d)(1)(A) is applicable to Smith's case.  (*Id*. at 1-2).  Under this subsection, the calculation date is one year from "'the date on which the judgment became final by conclusion of direct review or the expiration of time for seeking such review.'"  (*Id*. (quoting 28 U.S.C. § 2244(d)(1)(A) (other citation omitted)).  Smith and Respondent agree

---

[6] Smith filed an opposition (doc. 17) to the motion to dismiss and Respondent filed a reply (doc. 19) thereto.  Smith then filed two additional responses (docs. 21 & 27) in support of his opposition to the motion to dismiss, to which a second reply (doc. 29) was filed by Respondent.

that his case became final on October 2, 2000, the date the United States Supreme Court denied certiorari on direct appeal.  (*Id.*) (citing Vol. 26, Tab. R. 66); *Smith v. Alabama*, 531 U.S. 830 (2000)).

Although the one year statute of limitations may be tolled by a properly filed state post-conviction petition, Respondent argues Smith improperly filed his September 27, 2001, Rule 32 application and did not correct the error before the federal statute of limitations expired on October 2, 2001.  (Doc. 13 at 3)(citing 28 U.S.C. § 2244(d)(2)).  Respondent declares:

> Smith's Rule 32 petition was not properly filed until February 6, 2002. Smith mailed his Rule 32 petition on September 27, 2001, but did not include the requisite filing fee.  (Vol. 20, Tab. R. 46)  Smith never filed any motion to proceed in forma pauperis with the Madison County Circuit Court, and eventually paid the filing fee February 6, 2002.  (Vol. 20 at 1)  The Rule 32 court noted this as the date the petition was filed (Vol. 20, Tab. R. 46), and subsequently ordered the State to respond to the petition.  (Vol. 26 at 164)  Smith himself stated in his brief before the Alabama Court of Criminal Appeals that he "timely filed this Rule 32 petition on February 6, 2002."[7]  (Vol. 25, Tab. R. 59 at 1)  The Court of Criminal Appeals accordingly held that Smith's petition was filed effective February 6, 2002.  (Vol. 26, Tab. R. 68 at 2).

(*Id.*).

### 2.  The Petitioner's Response

In his initial opposition to Respondent's motion to dismiss, Smith argues:

> First, [the] habeas petition was properly filed within one year, thus tolling the AEDPA statute of limitations.  Second, even if this court finds [the] petition to be untimely, the egregious attorney errors committed by [the] state habeas attorney amount to an extraordinary circumstance, which when, coupled with Mr. Smith's due diligence in pursuing post-conviction relief, equitably tolls the statute of limitations.  *Sandvik v. United States*, 177 F.3d 1269, 1271 (11th Cir. 1991).

---

[7] At this juncture, Respondent placed footnote 1, which reads, "[Smith's] Rule 32 Petition was still timely under state law because the limitation period at the time was two years, though it was subsequently shortened to one year.  *See Barbour v. State*, 903 So.2d 858, 864 & n. 4 (Ala. Crim. App. 2004) (citing Ala. R. Crim. P. 32.2(c) (amendment effective August 1, 2002)).

Third, the State failed to disclose exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972); because this evidence could not be, and was not, discovered until late 2005, it is newly discovered for purposes of tolling the statute of limitations under 28 U.S.C. § 2244(d)(1)(D). Fourth, Mr. Smith has new evidence of legal innocence, which tolls the statute of limitations, of both the crime of capital murder and the two aggravating circumstances, murder with robbery and murder that was heinous, atrocious, or cruel. *Sibley v. Culliver*, 377 F.3d 1196, 1205 (11th Cir. 2004). Fifth, if equitable or statutory tolling is not granted, a miscarriage of justice will result. *Harris v. Hutcheson*, 209 F.3d 325, 330 (4th Cir. 2000). For these reasons, this Court should toll the statute of limitations and deny the Respondent's Motion to Dismiss. . .

(Doc. 17 at 4-5).

### 3. Relevant State Court Determinations

Prior to discussion of the issues, and because the arguments surrounding Smith's claims necessarily involve knowledge of the evidence presented during all aspects of trial, this court shall review the pertinent findings of fact in the guilt, penalty and sentencing phases of the trial, as made by the trial court in its Sentencing Order (Tab R-63), which is attached to the opinion of the Alabama Court of Criminal Appeals as "Appendix A."[8] Pursuant to 28 U.S.C. § 2254(e)(1), these factual findings are presumed to be correct.

### <u>SENTENCING ORDER</u>

Ronald Bert Smith, Jr., was convicted of a capital offense: intentional murder committed during the course of a robbery in the first degree or an attempt thereof, as charged in the indictment. Therefore, as required by Alabama Code § 13A-5-47(d)(1975), this Court enters the following findings of fact.

SUMMARY OF CRIME AND DEFENDANT'S PARTICIPATION

---

[8] The Rule 32 trial judge also attached and incorporated "Appendix A" as his findings of fact in his opinion denying Smith post-conviction relief. (*See* Vol. 23 at 616). Any additional factual findings made by any other state court during direct or collateral review will be reserved until an appropriate time in this opinion.

6

During the early morning hours of Tuesday, November 8, 1994, Ronald Bert Smith, Jr., Jay Zuercher, and Chad Roundtree were riding in a pickup truck owned by Smith, but then driven by Roundtree.  Smith turned to Zuercher and asked: "Do you want to do it?"[FN1 omitted] - "it" meaning, to rob the Circle C convenience store at the intersection of Byrd Springs Road with South Memorial Parkway.[FN2]  Zuercher replied, "Yes." [FN3]  Smith directed Roundtree to the store, and they parked behind it.

> FN2.  Following his arrest, defendant gave a tape-recorded statement to Huntsville Police Department homicide investigator William E. Payne, Jr., which was introduced into evidence as State's Exhibit No. 2.  Early in that statement Smith said: " We'd been driving around and we decided that we were going to rob the Circle C on Byrd Springs Road. ..."

> FN3.  Later in his taped confession, when asked by Investigator Payne to "give me the conversation" that led to the agreement to commit a robbery, Smith said: "There really wasn't much conversation."  Even so, it is noted that, "[f]or five or six months in 1992, Smith was employed as a clerk/cashier at [this same] Circle C Convenience Store. . . ."  (Pre-Sentence Investigative Report, at page 6.)  Consequently, Smith was familiar with the layout of the store.

Smith and Zuercher got out of the truck; Roundtree remained in the driver's seat.  Smith said to Zuercher: "I'm going to 'pop' the guy.  When you hear the shots, come in."  Zuercher replied: I've got your back," and proceeded to cover his head and face with a black T-shirt, "Ninja" fashion.[FN4 omitted]

Smith entered the store at 3:24:15 a.m.[FN5 omitted]  He walked quickly to the drink coolers and removed a soft drink.[FN6 omitted]  He then approached the counter area where Casey Wilson,[FN7 omitted] the lone clerk on duty at that time of night, was standing.

Smith placed the bottle on the counter.  As Wilson began to enter the cost of the apparent purchase into the cash register, Smith pulled a Colt .45 caliber semi-automatic pistol [FN8 omitted] from the waistband of his pants and

> "told the clerk to open up the register * * * to give me the money, but for some reason the register malfunctioned, so I was going to put him in the bathroom and try myself."

Later in his tape recorded statement, Smith reiterated the incident as

follows:

> "Then, I pulled the gun out and I said, 'open the register.' . . . He
> tried; he didn't really say anything. . . . He couldn't do it. So I
> started backing him up, and I said, you know, I was giving him
> this, and I said, 'get back, get back.' "

At 3:24:51 a.m., Smith forced Wilson at gun point into the restroom at the rear of the store. They were in the restroom area for nineteen seconds, during which Smith pistol-whipped Wilson about the head and body,[FN9 omitted] and shot him in the left arm.[FN10 omitted] In Smith's words:

> "He made a move at me, you know, [and] I pulled the
> trigger on the gun cause I was scared. * * * * [ *But, the gun* ] *didn't*
> *fire*. [FN11] * * * * *He reached out to grab me so I hit him with it.* * *
> * * And then he fell in the bathroom. I tried to get the door shut
> and I was, you know, real scared, and he started reaching for me, *so*
> *I pulled the trigger again, and this time it went off.*[FN12 omitted]

> > FN11. The first time Smith attempted to fire the
> > gun, the shell did not discharge. After Smith
> > shucked the misfired cartridge and rammed another
> > shell into the chamber of the semi-automatic pistol,
> > the gun fired. Investigators found the unfired .45
> > caliber bullet which was ejected when Smith reset
> > the gun: State's Exhibit No. 17.

At 3:25:02 a.m. (while Smith and Wilson still were in the restroom area) the videotape showed Zuercher entering the store, holding a gun in his right hand.[FN13 omitted]

At 3:25:10 a.m., Smith returned to the cash register; during the next thirty-four seconds, he tried to gain access by punching various keys.[FN14 omitted] He was not successful, and looked under the counter where the safe was located. He appeared to manipulate the safe's combination lock.

At 3:25:42 a.m., Smith returned to the restroom at the rear of the store. It is the opinion of this Court that, although not clearly in view, Smith fired the killing shot into Casey Wilson's head during the next thirteen-second interval.[FN15 omitted] The videotape shows Smith, after stepping out of the restroom, retrieving spent shell casings from the floor.

At 3:26:38 a.m., Zuercher reached toward a display rack near the cash register and grasped an object (apparently a pack of cigarettes), which he placed in

his pants' pocket.

At 3:26:45 a.m., Smith and Zuercher ran out of the store.  Before leaving the parking lot, however, one of them remembered the store had security cameras which probably had recorded the incident.[FN16 omitted]  Smith *twice* ran back into and out of the store: ultimately returning to a storage room where the videocassette recorder was locked in a metal cabinet.

At 3:31:31 a.m., the surveillance tape went blank.  Smith had used Zuercher's 9mm Beretta semi-automatic pistol to blast open the lock.  He ripped the recorder from the cabinet and left the store for the final time.  The three accomplices drove to Roundtree's apartment, where Smith removed the tape from the recorder.[FN17]

> FN17.  The videotape (State's Exhibit No. 8) ultimately was found by police in the seat springs of Smith's pickup truck, pursuant to a "consent to search" form signed by Smith (State's Exhibit No. 6).

At 3:59 a.m., a uniformed police officer arrived at the store in response to a customer's telephone call that no clerk was present.  Finding the restroom door closed, the officer pushed it open and discovered Casey Wilson lying on the floor in pools of blood.  He checked for a pulse, but detected none and secured the scene until homicide investigators arrived.

Almost one month passed before investigators developed their first lead.  On December 1, 1994, Monique Ferguson informed police that Smith had bragged to her of killing the clerk at the Circle C store.  Smith repeated his boast to Ferguson's boyfriend (now husband), Owen Ickes.[FN18]  Both agreed to assist police.  They were given a tape recorder, instructed to find Smith, and catch him talking about the murder.  During the early morning hours of December 2, Ferguson (who concealed the recorder in her purse) and Ickes (who wore a police "body wire") engaged Smith and Nick Mullins in a conversation on Hobbs Island Road near the Tennessee River.  During that encounter, Smith confirmed the substance of his prior statements: *e.g.,* Ferguson attempted to purchase Smith's .45 caliber pistol, but he refused to sell it, saying "it is *The* gun."  The tape was delivered to police.[FN19 omitted]

> FN18.  Owen Ickes testified that defendant said, "Yeah, I killed the guy at Circle C" in a manner "like he was bragging about it."

Owen Ickes later assisted police in obtaining fired shell casings from (and eventually purchasing) the 9mm Beretta semi-automatic pistol owned by Jay Zuercher.[FN20]  Ballistic tests confirmed that gun had been used to shoot open the

lock on the metal cabinet protecting the store's surveillance recorder.

On December 6, 1994, following directives from police, Owen Ickes persuaded Ronald Smith to accompany him to a shooting range for target practice with the .45 caliber pistol.  They left Smith's apartment in Ickes' truck.  En route, Ickes stopped at a convenience store and went inside, leaving Smith in the truck alone.  Smith was quickly surrounded by police and arrested.  After being advised of his *Miranda* rights, Smith gave a taped confession.[FN21 omitted]

The jury found Ronald Bert Smith, Jr., guilty of intentionally killing Casey Wilson with a pistol during a robbery in the first degree or an attempt thereof, in violation of *Alabama Code* § 13A-5-40(a)(2).

## THE SECOND-STAGE SENTENCING HEARING

Following a recess, this Court conducted a sentencing hearing before the same twelve jurors,[FN22 omitted] who returned a majority verdict recommending, by a vote of 7 to 5, a sentence of life imprisonment without parole. [FN23 omitted]

## THE THIRD-STAGE SENTENCING HEARING

Following preparation of a written pre-sentence investigative report,[FN24omitted] this Court conducted a nonjury sentencing hearing for the purposes of receiving evidence on any portion of the report which was the subject of factual dispute, receiving noncumulative evidence, and hearing arguments concerning the existence or nonexistence of aggravating and mitigating circumstances and the proper sentence to be imposed in the case.[FN25 omitted]

Based upon the evidence presented at trial, the evidence presented during the second- and third-stage sentencing hearings, and the pre-sentence investigative report, this Court now proceeds to "enter specific written findings concerning the existence or nonexistence of each aggravating circumstance enumerated in Section 13A-5-49, each mitigating circumstances enumerated in Section 13A-5-51, and any additional mitigating circumstance offered pursuant to Section 13A-5-52." [FN26 omitted]

## AGGRAVATING CIRCUMSTANCES

Only two of the eight aggravating circumstances listed in section 13A-5-49 were asserted by the State:

§ 13A-5-49(4) -"The capital offense was committed while the defendant was engaged or was an accomplice in the commission of, or an attempt to commit, ...

robbery ....."

The verdict finding defendant guilty of capital murder as charged in the indictment established this aggravating circumstance beyond a reasonable doubt. [FN27 omitted]

§ 13A-5-49(8) -"The capital offense was especially heinous, atrocious or cruel compared to other capital offenses."

. . . .

[T]his Court finds this aggravating circumstance to have been proven beyond a reasonable doubt.

This was an execution-style slaying. Casey Wilson was pistol-whipped and beaten into helpless submission, but Smith nevertheless killed him to avoid later identification.

. . . .

Casey Wilson, on his knees, bruised, bleeding from the beating Smith inflicted, begged for his life, for his newborn son.

"Ron hit the clerk and knocked him to his knees. And then he said the guy was holding up his hand telling him to 'stop, I got a baby. Stop, I got a baby, six-month-old baby.'"[FN28 omitted]

. . . .

The evidence also establishes that Smith inflicted death "with utter indifference to, *or even enjoyment of*, the suffering of" Casey Wilson. *Johnson v. State*, 399 So. 2d 859, 869 (Ala. Crim. App.) (cite omitted); aff'd in part, rev'd in part, 399 So. 2d 873 (Ala.1981). Chad Roundtree testified that when the three returned to his apartment following the incident, Smith bragged that "you should hear the sound a body makes when the last breath goes out of it." Smith, smiling, asked Roundtree if he wanted to watch the tape of the killing. (Roundtree ordered Smith to "get the hell out of my apartment!" and then vomited.)

Smith did not destroy the tape. In contrast, he threw the surveillance recorder into a trash dumpster and switched barrels in his gun to thwart ballistic identification. Thus, there is merit to the State's assertion he kept it as a "trophy." [FN29 omitted]

Nick Mullins, who altered the pistol, confirmed Smith bragged about the

slaying: he "smiled, and kind of laughed" when describing how Wilson had "pleaded for his life" before he killed him.

## § 13A-5-51 STATUTORY MITIGATING CIRCUMSTANCES

[(1) - (5) omitted]

(6) "The capacity of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired":

*Discussion*: Defendant contends his capacity to appreciate the criminality of his conduct was substantially impaired by his physical and mental states: *i.e.,* "he had imbibed quantities of Tanqueray [gin] and beer during the afternoon and evening leading up to the crime, and, he was in a seething rage over Casey Wilson's alleged relationship with [Ms. Stehle]."

Any alcohol consumption was voluntary and, even according to Smith's own testimony, did not negate a specific intent to kill.[FN30 omitted]  Smith's actions immediately following the crime, in finding a way to remove the videocassette recorder from a locked cabinet, demonstrate a thought process that was able to perceive a problem and solve it.  In flight from the crime, Smith demanded that Chad Roundtree, who was out of control from fear and panic, stop the truck and let him drive; Smith then drove far better than he.  Roundtree said Smith's speech was not slurred, and he was very definite in his directions.  Moreover, Smith gave no indication of mental distress or gross intoxication when, only a few hours later, he reported "as scheduled" to his job as cashier/clerk at the Discount Food Mart on Bailey Cove Road, and where ironically:

> "he was one of several employees . . . the manager spoke to about robbery procedures. . . .  Smith reportedly gave no indication as to what had transpired less than three hours earlier.  [Pre-sentence Investigative Report, at page 5 (emphasis added).]"

> At all times since that date, Smith has been able to clearly recall and relate the material events that occurred prior to, during, and after the commission of the offense.  Hence, there is no convincing evidence suggesting that alcohol affected Smith to any appreciable degree.

Smith denied going into the store for the purpose of robbery, saying police had suggested that motive during interrogation and he adopted the idea because it "sounded better" than the "true reason" for this crime.[FN31]  Smith said he went there in a seething rage, specifically intending to kill Casey Wilson for having an

12

affair with Smith's former lover: a nude dancer at the Fantasia nightclub whose stage name was "Alexis."[FN32]  The weight to be accorded this contention (that Smith killed while under the influence of a seething rage of jealous anger) depends, in large part, upon the credibility of Smith's assertion that Wilson had a relationship with "Alexis."  That proposition is refuted by these items of evidence:

> FN31. Smith explained he did not want his parents to know he had killed a man over a woman.

> FN32. Her true name is Ursula Kristine Stehle.

* Smith was the only witness who put Wilson either with "Alexis" or in the Fantasia nightclub.

* The dates Smith claims to have seen Wilson with "Alexis" fell during the week following the birth of Wilson's son.[FN33]  The paternal grandparents flew to Huntsville and spent October 1-6 with their son and daughter-in-law.  Except for going directly to and from work, Wilson was with his wife, son, and parents the entire time, and there was no opportunity, much less rational reason, for him to be cavorting with another woman.

> FN33. [footnote omitted].

* Smith never mentioned jealousy as a motive for killing to his accomplice, Chad Roundtree, or to his roommate, Josh Zimmerman.

* Smith never discussed such a relationship or purpose for the killing during several conversations with Monique Ferguson, who knew both Smith and "Alexis," and was familiar with the nightclub scene.

* Smith never hinted at such a nexus during his taped confession.  In response to the question, "So, what made you decide to rob that place?," Smith said: "To tell you the truth, I don't know."[FN34]

> FN34.  Just prior to that point in the taped confession, Payne asked Smith: "And how did y'all decide on what to rob?  Had y'all ever been there before; *did you know the guy or whatever*? " Smith replied that he had worked at the store "a while back," and then added: " *we didn't know*...."  The remainder of Smith's answer is as intriguing as it is inaudible.

* Smith never asserted such a basis for his actions to *anyone*, until a few days before trial.

These uncontroverted facts strongly suggest Smith's story was a last-minute fabrication, designed to reduce his culpability from capital murder to mere murder.

For all the foregoing reasons, this Court rejects defendant's contention that the sixth statutory mitigating circumstance was established.  *Thompson v. State*, 503 So.2d 871, 881 (Ala. Crim. App.1986), aff'd, 503 So.2d 887 (Ala.1987).

[(7) omitted]

## NONSTATUTORY MITIGATING CIRCUMSTANCES

*Alabama Code* § 13A-5-52 provides that a defendant is entitled to offer evidence of factors in mitigation other than those specifically listed in § 13A-5-51 above.

"These mitigating considerations, known generally as non-statutory mitigating circumstances, include every aspect of the character or record of the accused, or the circumstances surrounding the offense.  Examples of non-statutory mitigating circumstances include the nature of the defendant's family and societal relationships and responsibilities, no history of acts of violence, evidence of an impoverished, unstable, or traumatic childhood, good work, military, or prison habits or record, psychological problems, drug abuse, educational difficulties, cooperation with law enforcement, good character, expressions of remorse, or personal character adjustments during the defendant's incarceration."[FN36 omitted]

*The following nonstatutory mitigating circumstances were asserted by defense counsel during the second- and third-stage sentencing hearings.*

(1)  Prior to November 8, 1994, defendant had no history of assaultive behavior.

(2)  Since his arrest, defendant has shown no tendencies toward violence against others.

(3)  With the exception of the events on November 8, 1994, defendant always had been a quiet, polite individual.

*Discussion*:  These three are discussed together, because they are cumulative: as defense counsel said during argument, "they go hand-in-hand."

All evidence indicates that, during his formative years, Smith was a quiet, polite, respectful, even gentle young man.  There nevertheless was testimony about him fighting during the year before this crime: once assaulting another

patron of the Fantasia nightclub, whom he perceived to be bothering "Alexis," and on another occasion with Alexis herself.  In spite of that contradictory evidence, this Court finds these mitigating circumstances to have been substantially proven, and will give them appropriate weight.

(4) Prior to November 8, 1994, defendant had never fired a gun at anyone.

*Discussion*: Smith made this assertion during the third-stage sentencing hearing. (It should be contrasted with his pre-arrest boasts of being a Mafia hit man discussed infra). Such conduct is expected, and is not entitled to consideration in mitigation.

(5) Defendant did not resist arrest.

*Discussion*: When police approached the truck in which Smith was apprehended, he was observed by Investigator Payne to move his hand toward the .45 cal. pistol on the seat beside him. Payne warned Smith that, if he did not immediately put his hands on the dash where they could be seen, Payne would "blow his brains out." Smith complied, and did not thereafter struggle with arresting officers.  For that reason, this mitigating circumstance was substantially proven, but will not be given great weight.

(6) Defendant voluntarily confessed after being warned of his right to remain silent, without asking for the assistance of counsel.

*Discussion*: This was established: Smith's statement (State's Exhibit 2) was more descriptive and forthcoming than Chad Roundtree's (State's Exhibit 7).  It will be given consideration in mitigation.

[(7) omitted]

(8) The offenses were committed while defendant was under the influence of alcohol.

*Discussion:* Smith's consumption of alcohol has been fully discussed above, in relation to the sixth statutory mitigating circumstance. . . .  For the reasons stated there, influence of alcohol as a nonstatutory mitigating circumstance is rejected as not proven.

(9) The crimes committed were out of character for defendant.

*Discussion*: This statement is accurate, if one focuses only upon the years prior to Smith's graduation from high school.  Smith's family regularly attended a United

Methodist Church, where he was active in Youth Fellowship.  He was a Boy Scout, and attained the rank of Eagle [Scout] at 15.  He joined the Order of DeMolay, and several adult leaders say he was "a very trustworthy, easy-going young man" who "rarely would lose his temper," and who generally was well-liked and respected. Family friends and neighbors maintain he was quiet, polite, and respectful.  He graduated from one of the best schools in the public system with honors: a member of the National Honor Society his Junior and Senior years; awarded an "Advanced Diploma" at graduation; and offered (but refused) a three-year Naval ROTC scholarship to Auburn University.

The weight of the foregoing complex of mental and ethical traits marking Smith's formative years is lessened when one looks at the five and a half year period between his graduation from high school and the date of this crime.  Once Smith left the shelter of his parents' home for the unrestricted life of a college freshman, the path of his life took a very different turn.  He began to drink heavily, skipped classes, and withdrew from college before the end of the first year.  He returned home, but apparently not with the contrite humility of one who had squandered both educational opportunities and his parents' financial resources.  He quarreled rebelliously, eventually was "kicked out" of the household, and began to wander with other young men who were as lost as he. In a perverted effort to gain respect, Smith became a swaggering, "loud, mouth-runner," boasting of being a "hit man and collections person" for the "Dixie Mafia": "He said he collected on gambling debts." [FN37 omitted]  He fathered one child out of wedlock, and sank deeper into undisciplined, irresponsible conduct: drinking, and regularly "hanging out" at the Fantasia nude-dancing nightclub.

Without question, the attributes or features that make up and distinguish Smith's formative years stand in stark contrast to his adult conduct, and to this crime.  They also diverge from the background of cold-blooded killers: typically products of poverty, a broken home, physical or sexual abuse, and social deprivation.  Smith comes from an intact, middle-class family.[FN38 omitted]  Yet, those characteristics cut two ways. They are concurrently mitigating and aggravating.  Smith's background exposed him to virtually all of the values that are central to an ordered society; the awards of his youth opened avenues that pointed to a successful career based upon honest effort.  But, Smith spurned society's road signs and took the way that led him to where he is today. He chose to wallow in the gutter; he was not born into it.

Therefore, while this Court accepts this nonstatutory mitigating circumstance as having been substantially proven, the weight to be accorded it must be affected by all that has been said above.

[(10)-(16) omitted].

(17) Defendant is remorseful.

*Discussion*: Smith's swaggering and boasting after this murder, his demeanor when questioned by Investigator Payne,[FN39] and his testimony refute this contention.  It is rejected as a mitigating circumstance.  *See Ex parte Harrell*, 470 So.2d 1309, 1318 (Ala.), cert. denied, 474 U.S. 935, 106 S. Ct. 269, 88 L. Ed. 2d 276 (1985).

> FN39. Investigator Payne testified that Smith "was" cooperative during interrogation, but that he "never" exhibited sorrow or remorse.

(18) Defendant has made attempts to determine why he committed this offense in an effort to help himself and to prevent any further acts of violence by himself.

*Discussion*: There is not a great deal of evidence to support this assertion and, in any event, it is cumulative.  Hence, it is due little, if any weight.

In addition to the nonstatutory mitigating circumstances asserted by defense counsel, this Court notes the following circumstances which are suggested by the evidence or pre-sentence investigative report.

[(19)-(21) omitted]

## WEIGHING AGGRAVATING AND MITIGATING CIRCUMSTANCES

In summary, this Court has found that two aggravating circumstances were established by the evidence, beyond a reasonable doubt.  Those have been compared to and weighed against: one statutory mitigating circumstance; sixteen nonstatutory mitigating circumstances; and, the advisory verdict of the jury recommending that defendant be sentenced to life without parole.  Each aggravating and mitigating circumstance is discussed at length in the previous pages and will not be reiterated here, except to add that, in the judgment of this Court, none of the mitigating circumstances, individually or collectively, are entitled to great weight, especially when considered in relation to the nature of this crime.  The jury recommendation, by a majority vote of 7 jurors for life and 5 jurors for death, that defendant be sentenced to life imprisonment without eligibility for parole has been given a weight commensurate with the jury's vote division.

Therefore, following careful and deliberate consideration of all

circumstances, this Court is convinced beyond a reasonable doubt that the aggravating circumstances substantially outweigh the mitigating circumstances and jury verdict.

The savage brutality of this killing is shocking.  Defendant's acts demonstrate a pitiless indifference to Casey Wilson's fear, pain and suffering, and pleas for life.  The most chilling and heinous aspect of this crime is that defendant, unquestionably, enjoyed and reveled in his vile acts.

The United States Supreme Court has recognized that "certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."  *Gregg v. Georgia*, 428 U.S. 153, 184, 96 S. Ct. 2909, 49 L. Ed. 2d 859 (1976).  This is such a crime.  In the judgment of this Court, the only penalty which adequately reflects the gravity of the offense, promotes respect for the law, and provides just punishment for the defendant is death.

## ORDER OF SENTENCE

Accordingly, it is ORDERED, ADJUDGED, and DECREED that defendant, Ronald Bert Smith, Jr., be, and he hereby is, sentenced to death . . .  as punishment for the capital offense of which he has been adjudged guilty.  . . .

*Smith v. State*, 756 So. 2d at 946-49 ("*Appendix A*").

## II.  DISCUSSION

**A.    Was the federal petition filed within the statutory time limitations set out in 28 U.S.C. § 2244(d)(1)(A) of the AEDPA, and if not, is Smith entitled to equitable tolling?**

The parties agree that pursuant to 28 U.S.C. § 2244(d)(1)(A), Smith had one (1) year

from the date his case became final (*i.e.,* until October 2, 2001,) to file a federal habeas corpus

petition.  "Under 28 U.S.C. § 2244(d)(2), the limitations period is tolled for the time during

which a properly filed application for state post-conviction or other collateral review with respect

to the pertinent judgment or claim is pending."  *Holland v. Florida*, 539 F.3d 1334, 1338 (11th

Cir. 2008).  A "properly filed" application is one that is

> "deliver[ed] and accept[ed] . . . in compliance with the applicable laws and rules
> governing filings. . . . [E]xamples of these laws and rules [are] those which
> prescribe "the form of the document, the time limits upon its delivery, the court
> and office in which it must be lodged, and the requisite filing fee."

*Hurley v. Moore,* 233 F.3d 1295, 1297, n.2 (11th Cir. 2000) (quoting *Artuz v. Bennett*, 531 U.S.

4 (2000)).

In 2001, ALABAMA RULE OF CRIMINAL PROCEDURE 32.6(a) set out the form and filing

requirements applicable to Smith's Rule 32 application.  It reads in pertinent part:

> **Form, Filing and Service of Petition**.  A proceeding under this rule is
> commenced by filing a petition, verified by the petitioner or petitioner's attorney,
> with the clerk of court.  A petition may be filed at any time after entry of judgment
> and sentence. . . .  The petition should be filed by using or following the form
> accompanying this rule.  If that form is not used or followed, the court shall return
> the petition to the petitioner to be amended to comply with the form.  The petition
> shall be accompanied by two copies thereof.  It shall also be accompanied by the
> filing fee prescribed by law or rule in civil cases in the circuit court unless the
> petitioner applies for and is given leave to prosecute the petitioner in forma
> pauperis, in which event the fee shall be waived.  If the petitioner desires to
> prosecute the petition in forma pauperis, he shall file the In Forma Pauperis
> Declaration[9] at the end of the form.  In all such cases, the petition shall also be
> accompanied by a certificate of the warden or other appropriate officer of the
> institution in which the petitioner is confined as the amount of money or securities
> on deposit to the petitioner's credit in any account in the institution, which
> certificate may be considered by the court in acting upon his application for leave
> to proceed in forma pauperis.  Upon receipt of the petition and the filing fee, or an
> order granting leave to the petitioner to proceed in forma pauperis, the clerk shall
> file the petition and promptly send a copy to the district attorney . . . .

Smith acknowledges that the Rule 32 application filed on September 27, 2001, was not

accompanied by an In Forma Pauperis ("IFP") Declaration or the filing fee.  (Doc. 17 at 5-6).  He

also does not deny that he never filed a Declaration or statement of his prisoner account, and did

not pay the filing fee until February 6, 2002.  (*Id.*).  Instead, he states that "Alabama law does

---

[9] An In Forma Pauperis Declaration form is attached to Rule 32 as *Appendix A*.

require a motion to proceed in forma pauperis to be in a prescribed form." (*Id*. at 6 n. 5 (citing

Ala. R. Crim. P. 32.6(a)).  He further argues,

> In the prayer for relief at the end of Mr. Smith's state habeas petition, Mr. Smith stated: "Petitioner Ronald Bert Smith, Jr. respectfully asks this Honorable court to grant him the following relief. . . (b) provide petitioner, who is indigent, with funds sufficient to present witnesses, experts, and other evidence in support of the allegations contained in this petition."  (E.H. CR. 157).  While Mr. Smith's request to proceed in forma pauperis was not in the proper form, Alabama courts have no authority to provide funds to a petitioner absent a petitioner being deemed in forma pauperis.  Accordingly, it is implied, that Mr. Smith, in his prayer for relief, was requesting to proceed in forma pauperis.

(*Id*.).

Contrary to Smith's assertion, the foregoing language in his prayer for relief does not

imply that he be granted IFP status so that the filing fee could be waived.  The filing fee is not

even mentioned nor did Smith file a certified copy of his prison account funds as proof of

indigence.  Smith also does not provide any case law illustrating that Alabama has no authority to

"provide funds" in the absence of an IFP declaration.  In order to properly file the petition, the

mandatory language of Rule 32.6(a) required Smith file to a separate declaration form and proof

of financial indigence by producing a certified copy of his prison account.  Smith clearly did

neither.[10]

For the foregoing reasons, this court rejects Smith's argument that he properly filed his

Rule 32 application in accordance with State form and filing requirements.  The September 27,

2001, Rule 32 application was not properly filed, and therefore did not trigger the tolling

requirements of 28 U.S.C. § 2244(d)(2).  In order to trigger the tolling requirements of §

---

[10]The court also notes that the Rule 32 court did not treat the filing as including an IFP request.

2244(d)(2), Smith's Rule 32 petition had to be properly filed no later than October 2, 2001. Smith failed to do so.

Additionally, Smith alleges that his failure to file a "motion to proceed in forma pauperis . . . in prescribed form" should not bar his habeas petition because "this rule has not been firmly established or regularly followed" in Alabama.  (*Id*. (citing *Edwards v. Carpenter*, 529 U.S. 446, 450 (2002) (other citation omitted)).  Smith relies on *Hyde v. State*, 950 So. 2d 344 (Ala. Crim. App. 2006), to "highlight[] the confused nature and inconsistent practices related to motions to proceed in forma pauperis" in Alabama.  (*Id*. at 7).  However, in *Hyde*, the Alabama Court of Criminal Appeals simply held that when an IFP declaration is granted, the filing date of the petition is considered to be the day the Rule 32 application was initially filed in the clerk's office, not the day the trial judge granted the IFP declaration.  *Hyde*, 950 So. 2d at 352-53.

Smith also argues that Rule 32.6(a) cannot be considered a firmly established and regularly followed state procedural rule because "Alabama Courts have . . . allowed otherwise improperly filed state habeas petitions to be considered filed and toll the state statute of limitations."  (Doc. 17 at 7-8 (citing *Garrett v. State*, 644 So. 2d 977, 980 (Ala. Crim. App. 1994); *Ex parte Jenkins*, 972 So. 2d 159 (Ala. 2005); *Madden v. State*, 885 So. 2d 841, 844 (Ala. Crim. App. 2003)).  *See also* (Doc. 21 at 2-3 (citing *Smith v. State*, 918 So. 2d 141, 154 (Ala. Crim. App. 2005); *McNair v. State*, 706 So. 2d 828, 833 (Ala. Crim. App. 1997)).  However, these cases do not pertain to a petitioner's failure to properly file a declaration to proceed IFP and provide a certified prison account statement along with a Rule 32 application, nor do they present

analogous legal circumstances.[11]

Garrett v. State and Ex parte Jenkins concerned the fluctuating question of whether Rule 32 petitioners were required to comply with Alabama Rule Civil Procedure 15(c), commonly known as Alabama's relation-back doctrine.[12]  The Alabama Supreme Court settled the question in Ex parte Jenkins, holding that state post-conviction proceedings were governed exclusively by Rule 32 of the Alabama Rules of Criminal Procedure.  See Ex parte Jenkins, 972 So. 2d at 165. These cases are immaterial to the determination of whether the rule requiring the filing of a properly supported IFP declaration along with a Rule 32 application is a firmly established and regularly followed state procedural rule.  Additionally, the court can conceive of no circumstance in which a Jenkins' type of procedural issue (e.g., one that involves pleading requirements and thus necessarily presupposes proper form and filing) could possibly present itself in the same

---

[11]Respondent argues the Rule is firmly established and regularly followed.  (Doc. 19, pp. 5-6)(citing Ex parte Carter, 807 So. 2d 534, 536 (Ala. 2001).  In Carter, the Alabama Supreme Court held, "the petitioner must sign a statement of substantial hardship and the statement must be approved by the circuit court.  See § 12-19-70(b).  Rule 32.6(a) requires a party seeking to proceed in forma pauperis on a Rule 32 petition to file the declaration at the end of the required Rule 32-petition form.  Once the clerk's office receives the petition and the filing fee, or an order granting the petitioner permission to proceed in forma pauperis, the clerk shall file the petition. See Rule 32.6(a), Ala. R.Crim. P."  807 So. 2d at 536.

Smith takes issue with Carter, and two other supporting cases cited by Respondent, Ex parte Eckles, 736 So. 2d 595 (Ala. 1999) and Clemons v. State, unpublished 2003 WL 22047260, ___ So. 2d ___ Ala. Crim. App. 2003) (overruled by Hyde v. State, 950 So.2d 344 (Ala. Crim. App. 2006)).  (Doc. 21 at 3-4).  Yet, he admits "All of these cases merely say that an Alabama court may deny an improperly filed motion to proceed in forma pauperis."  (Id. at 4).  This admission proves Respondent's point - that the Alabama court's consistently deemed the cases improperly filed  because the applications to proceed IFP were either not filed or done so incorrectly.

[12] This rule governs the circumstances under which an amended "pleading relates back to the date of the original pleading."

22

procedural category as the form and filing rules traditionally used to gauge whether the statute of limitations in a habeas case has been tolled.

Moreover, the petitioner in *Madden v. State*, did properly file his Rule 32 petition and application to proceed *in forma pauperis*.  855 So. 2d at 844.  The issue in *Madden* was ultimately one of judicial error, in that the circuit court dismissed Madden's Rule 32 petition without first ruling on the application to proceed IFP.  (*Id*.).  The Alabama Court of Criminal Appeals advised that the circuit court, for jurisdictional reasons, must first rule on Madden's application to proceed IFP.  (*Id*.).  If the circuit granted the IFP application, it could then address the merits of the Rule 32 petition.  (*Id.*).

Smith next declares that the "Alabama Court of Criminal Appeals held 'that proper verification of a Rule 32 petition, although required by Rule 32.6(a), is not a jurisdictional prerequisite to the filing of the petition and, accordingly, that the lack of proper verification does not deprive the circuit court of subject matter jurisdiction.'"  (Doc. 21 at 2-3) (quoting *Smith v. State*, 918 So. 2d 141, 154 (Ala. Crim. App. 2005).

In *Smith*, the Alabama Court of Criminal Appeals battled with conflicting judicial interpretations as to "whether [the] lack of proper verification of a Rule 32 petition is a jurisdictional defect, necessitating dismissal of an appeal from ruling on a jurisdictionally defective petition, or whether lack of proper verification constitutes only a defect in the form of the petition that is subject to waiver."  *Smith v. State*, 918 So. 2d at 154.  While the court ultimately found that the lack of verification was not a jurisdictional defect, it was still, nonetheless, a defect as to form.  (*Id*. at 153).  The court wrote,

proper verification of a Rule 32 petition, although required by Rule 32.6(a), was

not intended to be a jurisdictional prerequisite to the filing of the petition.  Instead, the verification requirement is more appropriately a matter of form, the omission or inadequacy of which amounts to an irregularity that is subject to cure by a proper and timely amendment, and may be waived by the State if not properly raised.  This construction, we think, is consistent with this Court's relation back doctrine - - the timely filing of a Rule 32 petition that is not in the proper form tolls the limitations period of Ruled 32.2(c) so that the 'amended petition' relates back to the date of the filing of the original petition, provided the amended petition is filed within a reasonable time.

For purposes of this court's review, the question is not the uncertainty as to whether lack of verification deprived the court of subject matter jurisdiction, but whether the initial application was properly filed in accordance with state procedural rules - jurisdictional or otherwise.  *Artuz v. Bennett*, 531 U.S. at 8.  The Alabama Court of Criminal Appeals clearly maintained in *Smith v. State* that lack of verification was a defect as to form.  Similarly, the Eleventh Circuit Court of Appeals has recently stated, "the fact that Rule 32.6(a) is subject to waiver and is a non-jurisdictional defect 'renders it no less a "filing" requirement than a jurisdictional time bar would be; it only makes it a less stringent one.'"  *Melson v. Allen*, ___ F.3d ___, 2008 WL 4891206 at *3 (11th Cir. 2008) (citing *Allen v. Siebert*, 552 U.S. ___, 128 S. Ct. 2, 4 (2007)).

Finally, Smith contends the trial court in *McNair v. State*, despite a finding of lack of verification, addressed a Rule 32 petition and an amendment on the merits.  (Doc. 21 at 3). *See McNair v. State*, 706 So. 2d 828.  Smith misrepresents the opinion.  In *McNair*, the Alabama Court of Criminal Appeals related that the circuit court examined the Rule 32 petition, and made procedural default and merits findings.  Interspersed in the appellate court's recitation of the procedural history of the case was the following isolated comment, "The petition and the amendments are unverified."  *McNair v. State*, 706 So. 2d at 833.  Such an isolated comment and one which is limited to the verification requirement in one state court case is insufficient to

establish that Alabama's requirement that an IFP declaration and prisoner account certification be filed with a Rule 32 application is neither firmly established or regularly followed.

According to Respondent,

> The greatest evidence . . . that the original petition was not properly filed is that, upon realizing that the court had not acted on his petition, Smith paid the filing fee on February 6, 2002. (Vol. 20, Tab. R 46, at 1). It was not until this date that the case was docketed, and only subsequently did the Rule 32 court order the State to respond to the petition. (Vol. 26 at 164)  Had Smith intended to argue that the prayer for relief constituted an in forma pauperis motion (or that the other requirements of Rule 32.6(a) were not mandatory), he could have done so before the Rule 32 court rather than paying the fee.  Had that court rejected his argument, he could have petitioned the Alabama Court of Criminal Appeals and the Alabama Supreme Court for writ of mandamus.  *See Ex parte Davis*, 834 So.2d 830, 831 (Ala. Crim. App. 2002).  By instead paying the filing fee, Smith waived any argument that he was entitled to in forma pauperis, thus establishing February 6, 2002, as the date the petitioner was properly filed.  [footnote omitted].  Smith further ratified this filing date by stating in his brief before the Alabama Court of Criminal Appeals that he "timely filed this Rule 32 petition on February 6, 2002." (Vol. 25, Tab. R. 59 at 1).  The Alabama Court of Criminal Appeals accordingly held that Smith's petition was filed effective February 6, 2002.  (Vol. 26, Tab R. 68 at 2)[.]

(Doc. 19 at 8-9).  Respondent then asserts that Smith cannot raise the question of whether his IFP was properly filed because he deprived the state courts of an opportunity to do so,[13] and in any event, the state court would have found such a filing improper.  (*Id.* at 9).  The court finds

_____

[13] Smith counters that Respondent's assertion that he waived his argument concerning the in forma pauperis declaration "is an incorrect statement of law. . ." but he fails to explain this bare conclusion.  (Doc. 21 at 7).  While he is correct that the question is not whether he was due to be granted indigent status, the fact remains that he must have filed a proper IFP declaration and certification form in order to toll the statute of limitations before October 2, 2001.  This he did not do.

Smith also contends he could not have asked the state court to address a federal tolling question with regard to an Alabama procedural rule.  That may be the case, but Smith was required to preserve the issue by asking the Alabama court to interpret and apply its own procedural rule to his September 27, 2001, petition.

Respondent's argument to be well reasoned in light of Alabama case law.

In conclusion, Rule 32.6(a) is a firmly established and regularly followed state procedural rule and Smith failed to comply with that rule. Therefore, the federal statute of limitations was not tolled on September 27, 2001. Since Smith did not properly file an IFP application and supporting documents or pay the full filing fee by October 2, 2001, the statute of limitations was not tolled prior to its expiration date, and Smith's habeas petition is procedurally barred.

As a final note, although Alabama may allow an improperly filed form to toll ALA. R. CRIM. P. 32.2(c) as long as an amendment correcting same follows and relates back within a reasonable time thereafter, the Eleventh Circuit has ruled that the statutory tolling provision of § 2244(d)(2) does not allow an improperly filed application to be corrected and relate back to the original filing date, thus bringing the petitioner within the statute of limitations set out in § 2244(d)(1)(A). *Sibley v. Culliver*, 377 F.3d 1196, 1201 (11th Cir. 2004). The court wrote,

> We note that in closing that none of the documents [petitioner] attempted to file with the state courts after . . . - - the deadline for filing a federal habeas petition - - could in any way toll that deadline because, once a deadline has expired, there is nothing left to toll. A state court filing after the federal habeas deadline does not revive it. *See Moore v. Crosby*, 321 F.3d 1377, 1381 (11th Cir. 2003) ("While a 'properly filed' application for post-conviction relief tolls the statute of limitations, it does not reset or restart the statute of limitations period once the limitations period has expired. In other words, the tolling provision does not operate to revive the statute of the one-year limitations period if such period has expired.'"). Petitioner may not attempt to resurrect a terminated statute of limitations by subsequently filing documents that purport to "relate back" to previously submitted documents that were, in themselves, insufficient to toll the statute. *Id.* at 1381. ("The period of time in which a state prisoner does not have a 'properly filed' post-conviction application actually pending in state court."). Consequently, we need not examine the substance of his later filings because, even if they were "properly filed application[s] for State post-conviction or collateral review, they would not extend [the one year] deadline.

*Sibley*, 377 F.3d at 1204.

Since Smith's September 27, 2001, Rule 32 application did not trigger the tolling requirements of 28 U.S.C. § 2244(d)(2), the statute of limitations expired on October 2, 2001. Smith's February 6, 2002, payment of the filing fee cannot retroactively cure the improperly filed September 27, 2001, Rule 32 application. Therefore, Smith's petition for writ of habeas corpus is untimely.

**B.** **Should the statutory time limitation in 28 U.S.C. § 2244(d)(1)(A) be equitably tolled because of extraordinary circumstances and Smith's due diligence in pursuing post-conviction relief?**

The Eleventh Circuit Court of Appeals again recently noted that the Supreme Court has yet to decide whether AEDPA's statute of limitations permits equitable tolling. *Melson*, 2008 WL 4891206 at *4; *see also Sibley v. Culliver*, 377 F.3d at 1204. However, the Eleventh Circuit has stated that in order to gain relief by way of equitable tolling, a petitioner must

> show that there are extraordinary circumstances present in his case to warrant the application of equitable tolling. "Equitable tolling is an extraordinary remedy which is typically applied sparingly." *Steed* [*v. Head*,] 219 F.3d [1298,] 1300 [11th Cir. 2000)]. It is available "when a movant untimely files because of extraordinary circumstances that are both beyond his control and unavoidable even with diligence." *Sandvik v. United States,* 177 F.3d 1269, 1271 (11th Cir. 1999).

*Lawrence v. Florida*, 421 F.3d 1221, 1226 (11th Cir. 2005). "A truly extreme case is required." *Holland v. Florida*, 539 F.3d 1334, 1338 (11th Cir. 2008). It is the petitioner who has "[t]he burden of establishing entitlement to this extraordinary remedy." *Drew v. Department of Corrections*, 297 F.3d 1278, 1286 (11th Cir. 2002).

### 1.    Extraordinary circumstances

Smith argues the extraordinary circumstances[14] justifying equitable tolling of §

2244(d)(1)(A) in his case can be found in the egregious conduct of his post-conviction counsel,

Mr. C. Wade Johnson.  (Doc. 17 at 8).

Smith relates that volunteer lawyers with the Equal Justice Initiative ("EJI") drafted his

initial Rule 32 petition in late 2000, and in mid-July, 2001, were finally able to recruit William

Massey,  a Tennessee lawyer, to litigate the case in state court as pro-bono counsel.  (Doc. 27 at

7).  Pursuant to Alabama state bar rules, Massey "was required to associate with a member in

good standing of the Alabama Bar in order to appear *pro hac vice* on Mr. Smith's behalf."  (*Id.*).

---

[14] It is noted that in his opposition to the motion to dismiss and first response to in support
thereof that Smith pointed only to Mr. Johnson's performance as the "extraordinary
circumstances" necessitating equitable tolling.  It was not until Smith's *second response* in
support of his opposition to the motion to dismiss that he revealed for the *first* time that Johnson
was enlisted as local counsel, and the attorney who initially had agreed to prosecute his case was
a lawyer from Memphis, Tennessee named William Massey.  (Doc. 27 at 4-12).  By that time,
however, Respondent had already discussed Mr. Massey in its reply brief.  (Doc. 19 at 13-14).
Smith also waited until his *second response* to argue for the *first* time that

> [a] confluence of factors, including [that Alabama does not provide state
> appointed counsel to prepare post-conviction proceedings], the size of Alabama's
> death row and the accelerated rate at which it has recently grown, the ubiquitous
> influence of politics on the death penalty in Alabama, [footnote omitted] the
> widely-recognized poor quality of representation plaguing most death sentences in
> Alabama, [footnote omitted] and especially the byzantine operation of Rule 32,
> has engendered a crisis in the availability and quality of legal representation for
> death-sentenced inmates seeking relief via Rule 32.  It is only through the heroic
> efforts of volunteer, essentially pro bono, attorneys and social justice advocacy
> groups that substantially any death-sentenced inmates in Alabama are able even to
> file state post-conviction challenges to their convictions and sentences.

(Doc. 27 at 5-6).  The "confluence of factors" listed by Smith are immaterial and irrelevant to the
real question before the court; and that is whether the representation he received from his post-
conviction counsel constitutes an extraordinary circumstance.

Massey associated with Alabama attorney C. Wade Johnson.  (*Id*.).[15]

In any event, the Rule 32 petition bearing Johnson's handwritten signature, and the typewritten name of Massey and his law firm was not filed until September 27, 2001.  (Doc. 27, Ex. C).  On October 15, 2001, Mr. Johnson's firm informed Massey's law firm by letter that "'the Madison County Circuit Clerk's office sent the Petition to our office with a note attached saying that a filing fee of $154.00, or informa [sic] pauperis, is required to file the Petition. Please submit the filing fee and the application for pro hac vice to our office at your earliest convenience, so that we may get this Petition filed.'"  (Doc. 27, Ex. E).  Yet, "Massey did not pay the filing fee until February 6, 2002, after the State raised the filing deficiency- and its attendant jeopardy to Mr. Smith's timeliness under Rule 32's statute of limitations – in a phone call with him and in a letter to Mr. Johnson which was forwarded to Mr. Massey by Patricia Lackey, the trustee appointed by the Alabama Bar to protect Mr. Johnson's former clients' interests. [footnote omitted]."  (Doc. 27 at 9-10 and Exs. G-H).[16]

Unbeknownst to Smith, Mr. Johnson had a severe drug addiction "which resulted in his suspension by the Alabama Bar within three months of the filing [of the September 27, 2001,] Rule 32 petition and [his] eventual suicide" on August 16, 2002.  (*Id*. at 8 and Doc. 17 at 4). Smith contends the criminal, financial and professional difficulties[17] associated with Johnson's

---

[15] The court again notes that in his opposition to Respondent's motion to dismiss and his first response to Respondent's reply, Smith only places blame on Mr. Johnson, and never once mentions Mr. Massey.  (*See* Doc. 17 at 8-12) and (Doc. 21 at 9-10).

[16] The letter to Mr. Johnson from the Attorney General's office is dated February 4, 2002. (Ex. G).  The letter from Ms. Lackey to Mr. Massey is dated February 20, 2002.  (Ex. H).  In it, she also acknowledges that Mr. Massey had found new local counsel to represent Smith.

[17] *See* Doc. 17-2, 17-3; *also described as* Doc. 17, Exs. A-I.

addiction easily could have been, but were not discovered by Massey.  (Doc. 27 at 9, n.8).

Moreover, other than the September 27, 2001, filing of the petition and the February 6, 2002,

payment of the fee, neither Massey or Johnson took any other action on the case.  (*Id*. at 10 &

n.11).  He asserts that Massey did not even verify the petition, and the State filed a motion to

dismiss on that basis.  (Doc. 27 at 10).  In short, Smith alleges that the Rule 32 petition prepared

by EJI merely passed from that firm to Massey's law firm, then to Johnson, whereupon it was

filed in the county courthouse.  According to Smith,

> [i]n accepting but then abdicating the responsibility of properly filing Mr. Smith's
> petition, Mr. Massey essentially abandoned Mr. Smith . . .
>
> Mr. Smith, assured that he had obtained counsel and relying on promises
> that his counsel would file his Rule 32 petition in order to toll the federal statute
> of limitations, in fact had counsel in name only from approximately mid July
> 2001, until Brian M. White[18] noticed his appearance and filed a proper
> verification of the petition on March 25, 2002.

(*Id*.).  To Smith, "[a]bandonment by counsel - whether as a result of incompetence or

indifference - can rise to the level of egregious attorney error or misconduct warranting equitable

tolling."  (Doc. 27 at 11) (citing *Downs v. McNeil*, 520 F.3d 1311, 1321 (11th Cir. 2008) (in turn

citing *Rouse v. Lee*, 339 F.3d 238, 250 n. 14 (4th Cir. 2003)).

On the other hand, Respondent argues:

> Smith cites a number of personal problems experienced by his Rule 32 counsel
> Mr. C. Wade Johnson. . . .  However, the relevant question is not the severity of
> Johnson's personal struggles, but his specific conduct in handling this case.  The
> only error alleged by Smith that is relevant to the limitations period was the

---

18  Mr. White became Smith's counsel in March 2002, and was joined by another
attorney, Mr. Pullen.  Smith was afforded an evidentiary hearing on his claims of ineffective
assistance of trial counsel, and pursued the denial of his Rule 32 petition through the state court
appellate system.  (*See* Vols. 26-27, Tab. R. 67, for the trial court's order and Vol. 27, Tab. R. 68
for the appellate court's unpublished opinion in *Smith v. State*, CR-02-1691).

failure to file an in forma pauperis motion with the petition.

Furthermore, Johnson was co-counsel with Mr. William D. Massey of Memphis, Tennessee.  (Vol. 20 at 3) Smith has not made any allegations that Massey suffered from personal problems or other debilitations, despite the fact he was equally responsible for the filing error. . . .  Johnson and Massey did not deceive Smith for months and years without taking any action . . . .

Johnson and Massey made a single error that ultimately prevented the § 2254 limitations period from tolling.  Their mistake, however, fits squarely within the category of error that [the Eleventh Circuit has] . . . found insufficient to support equitable tolling.  *See Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000).

(Doc. 19 at 13-14).

After careful examination of Smith's allegations against his attorneys and applicable case law, this court finds that at best, the failure of Massey and Johnson to properly file an *in forma pauperis* declaration constituted gross negligence.  The Eleventh Circuit has recently explained its position on the matter as follows:

. . . .  [T]his Court has said repeatedly that . . .  attorney negligence is not a basis for equitable tolling.  *Helton*, 259 F.3d at 1313; *Steed v. Head*, 219 F.3d 1298, 1300 (11th Cir. 2000); *Sandvik v. United States*, 177 F.3d 1269, 1271-72 (11th Cir. 1999); *see also Lawrence*, 127 S. Ct. at 1085 ("Attorney miscalculation is simply not sufficient to warrant equitable tolling, particularly in the postconviction context where prisoners have no constitutional right to counsel.").  But recently we addressed whether attorney misconduct going beyond "mere negligence" may constitute an extraordinary circumstance warranting equitable tolling.  *See Downs v. McNeil*, 520 F.3d 1311 (11th Cir. 2008).

In *Downs*, we vacated a district court order dismissing a habeas petition as untimely based on counsel's alleged behavior that "ran the gamut from acts of mere negligence to acts of gross negligence to acts of outright willful deceit."  *Id.* at 1323.  Although we viewed counsel's behavior as a whole, it is material to the *Downs* decision[19] that the alleged acts of attorney misconduct included

_____

[19] The full holding in *Downs* reads:

In determining whether Downs has alleged extraordinary circumstances that, if

31

affirmative misrepresentations by counsel about the filing of a state habeas petition: such a filing would have tolled the federal habeas limitations period.[FN8] *Id.* at 1323-24.  In *Downs*, we repeatedly and specifically noted counsel's lie: one that deprived the unknowing petitioner of as many as three months of his limitations period before it was discovered.[FN9]  *Id.*

> FN8. In two recent unpublished decisions, we reached similar conclusions.  *See Kicklighter v. United States*, No. 07-14945, 2008 WL 2421728 (11th Cir. June 17, 2008) (unpublished); *Hammond v. Frazier*, 275 Fed. Appx. 896 (11th Cir.2008) (unpublished). Both cases involved allegations of affirmative misrepresentations by counsel.  *Kicklighter*, 2008 WL 2421728, at *1 (petitioner alleged that counsel "lied to him about whether the appeal had been filed"); *Hammond v. Frazier*, 2008 WL 1891478, at *1 (petitioner alleged that "post-conviction counsel falsely told him that counsel had filed the state habeas petition").

> FN9. The defendant in *Downs* missed the deadline for filing his habeas petition by only eight days.

In contrast to *Downs*, Petitioner made in the district court no allegation of knowing or reckless factual misrepresentation or of lawyer dishonesty.  Instead, Petitioner's allegations are limited to [counsel's] failure to communicate with Petitioner on the status of his case and to [counsel's] failure to file a federal habeas petition timely, despite repeated instructions to do so.  We will assume that [counsel's] alleged conduct is negligent, even grossly negligent.  But in our view, no allegation of lawyer negligence or of failure to meet a lawyer's standard of care-in the absence of an allegation and proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth on the lawyer's part-can rise to the level of egregious attorney misconduct that would entitle Petitioner to equitable tolling. Pure professional negligence is not enough. This case is a pure-professional-negligence case.  We decline to extend *Downs* to the different facts of this case.[FN10]

---

true, would entitle him to relief, we must consider all relevant facts.  These include his unequivocal, repeated demands that his attorneys file his habeas petition; his close tracking of his attorneys' work and the applicable federal deadlines; and his counsel's overt deception in representing they had filed a tolling petition in state court when they had not in fact done so, thereby depriving him of several months of his statutorily-guaranteed one-year federal limitations period.

*Downs*, 520 F.3d at 1322.

> FN10. We recall the maxim that "[e]very exception not watched, tends to take the place of the rule." *See* S. Peloubet, *Legal Maxims* 294 (1884) (1985 ed.) ("Toute exception non surveillee tend a prendre la place du principe.").  We are attempting to keep the exception for extraordinary circumstances from being the rule.

*Holland v. Florida*, 539 F.3d 1334, 1339-1340 (11th Cir. 2008).[20]  *See also Melson*, 2008 WL 4891206 at *7 (reiterating that attorney negligence is insufficient–"There must be 'an allegation and proof of bad faith, dishonesty, divided loyalty, mental impairment or so forth. . . .").

The court finds that the relevant factual circumstances in Smith's case are the type of negligence or gross negligence found in *Holland*, and do not rise to the extreme circumstances found in *Downs*.  Smith's counsel made no misrepresentations to him nor did they engage in

---

[20] *Holland v. Florida*, also forecloses Smith's complaint that the Circuit Court of Madison County did not send him a deficiency notice and the Alabama State Bar failed to inform Smith that Johnson was transferred to disability status and removed from the case.  The Eleventh Circuit wrote:

> In a similar way, we are not persuaded that the alleged acts of the Florida Supreme Court or the Department of Corrections would entitle Petitioner to equitable tolling.  The alleged failure by the Florida Supreme Court to conduct oversight of Petitioner's appointed attorney is not an "extraordinary circumstance" entitling Petitioner to equitable tolling.  *See Lawrence*, 127 S. Ct. at 1085-86 (that a state court appoints and supervises counsel "does not make the State accountable for a prisoner's delay").  And Petitioner presents no evidence that he ever asked-before the limitations period for filing his federal habeas petition had run-that the Florida Supreme Court provide him directly with notice of the decision on his post-conviction appeal.  The letter that Petitioner presents to support his contention that the Florida Supreme Court should have provided him with notice was dated 21 December 2005: nine days after Petitioner's deadline for filing his federal habeas petition had passed.  Likewise, the incident in which the Department of Corrections allegedly denied Petitioner access to the "writs room" took place on 9 January 2006: 28 days beyond the limitations period.  Even assuming the allegations are true, Petitioner cannot reasonably argue that the incidents to which he draws our attention-both occurring after the limitations period had run-prevented him from filing a federal habeas petition timely.

*Holland*, 539 F.3d 1334, 1339-1340.

willful deceit.  That Mr. Johnson was harboring a severe substance abuse problem during the time Smith's Rule 32 application was filed is but one relevant factor among many others that clearly shows the failure to properly file the Rule 32 application was a product of negligence. The court expressly finds that while Smith's Rule 32 counsel were negligent, such conduct is insufficient to rise to the level of extreme circumstances necessary to justify equitable tolling.

### 2.    Due diligence

Smith contends he pursued the matter with due diligence because there was nothing about the manner[21] in which the post-conviction case was litigated that could have alerted him he was in danger of missing the October 2, 2001, federal filing deadline.  (Doc. 17 at 12-15).  He also declares his error caused no prejudicial delay to the State of Alabama.  (*Id*. at 13).  Respondent argues:

> . . . .  [Smith] fails to allege that he took any steps to determine if the Rule 32 petition had been filed.  Had he done so, he would have readily discovered that the petition had not been properly filed, given that the trial court did not accept the petition or assign a case number.  He also does not allege that he took any steps to encourage Johnson and Massey to finish the petition earlier, so that any filing errors could have been corrected in time to toll the AEDPA limitations period, or that he was even personally aware of the existence of the AEDPA limitations statute.

> . . . .

> Simply put, Smith has not alleged a single act of diligence on his part. [footnote omitted].

(Doc. 19 at 15-16).

A careful review of Smith's inaction and Eleventh Circuit precedent clearly shows Smith

---

[21]  Smith attaches copies of written communications between his own counsel and between his counsel and opposing counsel, along with court documents to show he had no reason to believe that his case was not being properly litigated.  (Doc. 27-2, Exs. B-L).

did not exercise due diligence in assuring that his Rule 32 petition was properly filed on or before

October 2, 2001.  The following portion of the *Downs* opinion provides a clear explanation of

due diligence and an illustration of the facts necessary to finds that a petitioner has indeed been

diligent.

> "Due diligence . . . does not require a prisoner to undertake repeated exercises in futility or to exhaust every imaginable option, but rather to make reasonable efforts."  *Aron v. United States*, 291 F.3d 708, 712 (11th Cir. 2002).  "Moreover, the due diligence inquiry is an individualized one that must take into account the conditions of confinement and the reality of the prison system."  *Id.* (internal quotations omitted).  The facts Downs alleges, if true, establish that he acted with due diligence to ensure his petition would be timely filed.  Between June and November 2001, Downs wrote to three CCRC attorneys to express concern over the running of the AEDPA filing period and to urge the filing of his federal habeas petition or an additional state court pleading.  In addition, Downs attempted to assist his attorneys in drafting his federal petition by providing them with either a draft petition or a list of issues to be included in the petition.  These allegations suggest Downs acted with appropriate diligence.

*Downs*, 520 F.3d at 1323.

Unlike *Downs*, Smith never expressed any concern over the running of the AEDPA

statute of limitations on October 2, 2001, either to his counsel or the state court system.[22]

Smith's complete inaction cannot be considered a reasonable effort and cannot rise to the level of

due diligence.[23]

In conclusion, any attorney error for failure to comply with Rule 32.6(a) in Smith's case

---

[22] Moreover, his assertion that "the state was not prejudiced by [his] failure to file a properly prescribed motion to proceed in forma pauperis" (doc. 17 at 13) is immaterial and irrelevant to the issue.

[23] The errors of counsel and showing of any diligence to ascertain the federal filing deadlines first appear in this habeas petition.  Because Smith's federal petition was already time barred on October 2, 2001, his complaints about counsel, and his own actions thereafter are immaterial and irrelevant to the real question.

was nothing more than negligence, and "attorney negligence is not a basis for equitable tolling, especially when the petitioner cannot establish his own diligence in ascertaining the federal habeas filing deadline." *Lawrence v. Florida*, 421 F.3d 1221, 1226 (11th Cir. 2005) (citing *Howell*, 415 F.3d at 1250; *Helton,* 259 F.3d at 1313; *Steed*, 219 F.3d at 1300; *Sandvik,* 177 F.3d at 1270)).  For the foregoing reasons, the court finds that Smith's petition for writ of habeas corpus was not filed within one-year statute of limitations as required by 2244(d)(1)(A), nor is he entitled to equitable tolling of that statutory period.

**C.     Whether the petition is timely pursuant to 28 U.S.C. § 2244(d)(1)(D), and if not, is equitable tolling justified?**

**1.     28 U.S.C. § 2244(d)(1)(D)**

Smith next asserts that his "federal habeas petition [is timely because it] relies on facts discovered in the Autum[n] of 2005 that could not have been discovered earlier with the exercise of due diligence."  (Doc. 17 at 15) (citing 28 U.S.C. § 2244(d)(1)(D)).  Specifically, Smith alleges "the State failed to disclose evidence related to Ms. Stehle, one of its key witnesses, which would have impacted her credibility."  (*Id.* (citing *Brady v. Maryland*, 373 U.S. 83 (1963), and *Giglio v. United States*, 405 U.S. 150 (1972)).  The circumstances surrounding Smith's assertion, as described by Smith, are that the District Attorney's office became aware mid-trial of Ms. Stehle, a surprise defense witness, and

> [a]lmost immediately. . . , after repeatedly harassing Ms. Stehle's family, tracked her down at the hospital where she worked as an emergency room nurse.  . . .  The investigators threatened Ms. Stehle and the hospital staff until Ms. Stehle finally spoke to the investigators.  Ms. Stehle's supervisor and personnel manager were so concerned at the aggressive behavior of the investigators that they advised Ms. Stehle to retain an attorney.
>
> After two hours of berating and threatening Ms. Stehle, the investigator left the hospital.  Ms. Stehle was so overcome that her supervisor recommended

36

that she be admitted to the hospital for care.  After the incident, Ms. Stehle refused to speak to Mr. Smith's trial counsel because she felt betrayed and believed that her job at the hospital was at stake.

As a result of the investigators' actions, the State's Attorney General's office authored a report detailing the investigators's actions. [footnote omitted]. The State, however, failed to disclose the contents of that report to the defense. Further, the State failed to inform the defense of the hostile and threatening nature of the interview.

(Doc. 17 at 16).

Smith contends that if Ms. Stehle had not been harassed by investigators, "she would have testified that she knew Mr. Wilson[,]" instead of testifying at trial that she did not know Wilson.  (*Id*. at 17).  Smith also declares he could not have discovered this claim earlier because

[t]he State, despite its representations concerning *Brady* material at trial and in post conviction, did not reveal the entire contents of its conversation with Ms. Stehle.  Although Mr. Smith has had reason to suspect that the State withheld such information, it was not until recently that he has been able to get that information from Ms. Stehle.  The State has still failed to turn over the exculpatory report regarding the investigator's hostile and coercive interrogation of Ms. Stehle.

(Doc. 21 at 14).

Smith further argues against the prosecution's assertion that even if Ms. Stehle had testified to the information she has now revealed to him, said information is immaterial.  (*Id*.). He asserts the information is material because Ms. Stehle "would now testify that she remembers a specific incident involving the victim, Mr. Wilson and Mr. Smith."[24]  Smith writes as follows:

Ms. Stehle would now testify that she remembers a specific incident involving the victim, Mr. Wilson and Mr. Smith. . . .  Mr. Smith's defense was to show that the shooting of the victim was predicated on a jealous outburst, thus making Mr.

---

[24] In his initial opposition to the motion to dismiss, Smith indicated that Ms Stehle also now remembers "the details of the conversation she had with the district attorney's investigators." (Doc. 17 at 18).

>Smith guilty of a lessor included offense of capital murder.  The nature of . . . the shooting as a jealous outburst, would have also have negated the aggravating factors of heinous, atrocious, or cruel, and robbery. . . .  Thus, Mr. Smith was entitled to this material information.

(Doc. 21 at 14-15).  The revelation regarding Mr. Wilson by Ms. Stehle reads, "Although Mr. Wilson never appeared to be interested in the dancers at the club, Ms. Stehle remembers that he would sometimes play pool at the [club].  On one occasion, she asked him [(Wilson)] if she could join him in a game.  Mr. Smith arrived at the club intoxicated, saw the two of them playing pool together and threw a drink on Ms. Stehle.  Mr. Wilson intervened, stepping between Ms. Stehle and Mr. Smith, and Mr. Smith was kicked out of Fantasia and temporarily banned from returning."  (Doc. 17 at 21-22).  Smith does not allege that the prosecution was privy to Stehle's revelation at the time of trial or during post-conviction proceedings.  Instead, Smith argues that had the foregoing information been before the jury, "it is more likely than not" that he would not have been convicted of capital murder and the trial judge "would not have found the aggravating factor of heinous, atrocious or cruel and overridden the jury's verdict."  (*Id.*).

28 U.S.C. § 2244(d)(1)(D) reads:

>(d)(1)  A 1-year period of limitation shall apply to an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court.  The limitation period shall run from . . .[25]

>>(D)  the date on which the factual predicate of the claim or claims presented could have been discovered through the exercise of due diligence.

Respondent argues that Smith has failed to assert "a *Brady* claim that can overcome the limitations period because his claims – in addition to being facially meritless – are not based on

---

[25] Excluded is "the latest of –," with the court recognizing the calculable date can be the latest of four possible scenarios set out in Sections (d)(1)(A)-(D).

newly discovered evidence." (Doc. 19 at 2). In support of this position, Respondent asserts:

> Smith's *Brady* claim appeared for the first time in his amended petition, filed December 5, 2005. . . . . However, the claim fails to allege that it is based on a newly discovered factual predicate. He does not identify what new facts, if any, underlie the claim, nor does he allege, much less demonstrate, that such facts could not have been discovered through the exercise of due diligence. . . . .
>
> . . . .
>
> The brief also brings forth the new allegation that there was a report produced by the Attorney General's Office that details investigator's actions in interviewing Ms. Stehle, that this report was not disclosed, and that the report showed that the investigators intimidated Ms. Stehle into testifying falsely. Doc. 17 at 16-17. The brief cites argument from the hearing on Smith's motion for new trial to suggest that such a report exists. At the hearing, the following exchange occurred:
>
>> MR PULLEN: . . . Mrs. Ferguson met with Ms. Stehle and secured her agreement to come and testify in court. And he - -
>>
>> COLONEL TAYLOR: Excuse me. If we are going to get into that, you are going to call her. We are going to have to call **Investigator Harry Renfroe**, and this thing is going on and on and on.
>>
>> I know where you are going, and it's been settled, **investigated by the Attorney General's Office**, and it's there.
>
> (Vol. 12, Tab. R 32 at 57 (emphases added by Respondent)). Ms. Ferguson had already raised questions about the State's investigatory tactics, giving Smith ample reason to investigate Ms. Stehle's contact with State investigators. And Smith's *only basis for* asserting that a report containing *Brady* evidence exists is the statement above, made by the prosecutor at the May 23, 1996, new trial hearing.
>
> Smith therefore has a high burden to demonstrate why this claim, through the exercise of due diligence, could not have been discovered and raised long ago, instead of *ten years after the trial*. Smith does not, and cannot meet this burden.

(Doc. 19 at 18-20 (italics in original)).

In order to understand the purported factual predicates alleged by Smith in the context of

the Stehle defense, as it played out in the guilt and penalty phases of Smith's trial, the court also

turns to factual findings made by the Rule 32 court in the post-conviction record, which read:

> About a week before trial, Smith finally gave counsel information, which supplied the defense they actually used at trial - that Smith had committed an intentional murder, but that there was no robbery.  HR. 30[26] ("We were going for a plain murder as opposed to a capital murder."); 79.  Smith told them about his relationship with a stripper, Stehle, who worked at the club Fantasia.  HR 39.  Smith told them that he had seen Stehle with[27] the victim at the club at that, after that, she disappeared, ending her relationship with Smith.  HR. 39-40.  Smith said this was the reason he killed Casey Wilson after discovering where he worked.  HR. 40.  This led to the development of their new trial strategy.  HR. 40.
>
> The investigator Kempaner hired apparently followed up on this information, the same day it was provided, talking to at least two individuals at Fantasia who could place Smith and Stehle together.  HR. 40, 44; State's Exhibit 2; *Compare* HR. 31 (Ferguson's testimony they learned about Stehle on July 24, 1995) with State's Exhibit 2 (revealing Reliford and Seagroves were interviewed a second time on July 24, 1995 for two hours).  Even some of the State's witnesses admitted Stehle and Smith's relationship at trial.  HR. 80.  Ferguson also testified that a continuance was not needed even though they only had one week to prepare new strategy.  Smith never named anyone who could put Stehle and Wilson together.  HR. 81.  There was no indication any witnesses could do that, but plenty of witnesses were able to put Stehle and Smith together.  HR. 80-81.  The evidence clearly showed Smith's intent to kill.  But, the evidence supported the new theory that Smith only intended to kill not to rob.  HR. 85-86.  According to Ferguson, the intent to rob was "unbelievable" because of the "witness testimony that there was some other motive to go there and kill that man, also from . . . the videotape.  That was a convenience store that Smith had worked in.  [But, he] couldn't get the register open?  We felt there were things goings [on] the videotape that lent itself to someone not genuinely trying to rob the place."  HR. 34-35; 85-86; 108.  In addition, Smith did not take anything from the

---

[26]References herein to "HR. ___" are to the Rule 32 hearing transcript found at Volume 24 of Document 11.

[27] Ferguson testified, "And the information I had [from Smith] was that the victim in this case had frequented this club; that Ron had seen this Ursula Stehle with the victim and that at some point she dropped out of sight. . . . .  And I think some of the last contact or sight he had had of her, he had seen her with this Casey Wilson and that when he realized where Casey Wilson worked, then he went there to kill him."  (Vol. 24, Tab. R. 58, HR. 39-40).

> store except the VCR.  HR. 108.  And, [the co-defendant's] taking of the pack of
> cigarettes was completely out of Smith's sight.  HR.  109.  They also used his
> drinking to bolster the new defense - - to convey that people do things they would
> not normally do when drinking and that this affect was compounded by Smith's
> obsession with Stehle.  HR. 82.

(Vol. 26, Tab. R. 67 at 647-49).

Additional contextual information concerning the manner in which the defense played out

behind the scenes at trial is found in the testimony of trial counsel during the Rule 32 evidentiary

hearing.  To that end, Ferguson testified that she spoke with Stehle "on the phone on July 31.  I

talked to her again on the phone on the first of August, and then I met with her on August 2."

(Vol 24, Tab. R.58,  HR. 40-41).  While Stehle "was willing to be involved and participate, . . .

she was married and she was trying to keep this side of her life, I guess, hidden from her

husband, hidden from her co-workers, and so . . . she wasn't just really willing to jump in; she

was hesitant."  (*Id*. at 42).  During the August 2 meeting, Ferguson testified that the following

occurred:

> [Stehle] told me that she had a ["[p]retty tumultuous[,]" "romantic", and "sexual"]
> relationship with Ron.[28] And I - - the only thing I had in terms of a picture of
> Casey Wilson was some news broadcast someone in the district attorney's office
> had given me.
>
> And, so, we brought a TV in, put the tape in the VCR, paused it to get a
> look at this guy before she got on the stand.  She could not commit that she knew
> him and wouldn't commit that she knew him.  She said it was possible.
>
> She did say that Ron was extremely jealous and, basically, that was it.
> That there was a possibility he had seen her with this guy down there.  She didn't
> know.
>
> There were lots of men that came and went down there and every time she
> seemed to strike up any conversation or anything with men when Ron was down

---

[28] (*Id*. at 54).

there, he would get extremely jealous.

(*Id*. at 53).

However, at trial, Stehle denied she had a sexual relationship with Smith, characterizing it as "[m]ore of a friendship."  (*Id*. at 54).  Stehle also adamantly  "denied knowing Casey Wilson" at trial, when she previously had been "more open [with Ferguson] about the possibility that she might have seen [Wilson], [and that] he might look familiar[.]"  (*Id*.).

Ferguson declared the reason for the change in Stehle's testimony was that, contrary to Ferguson's belief that Stehle's testimony should be a tactical surprise at trial, her co-counsel, Richard Kempaner, revealed Ms. Stehle's name during cross-examination of a State witness, and then informed the media of the defense.  (*Id*. at 51).  Kempaner's actions occurred "on the 2nd or 3rd of August, which would have been in the middle of [the trial]." (*Id*.).  Once these actions occurred, Ferguson testified,

> Well, I knew that the Huntsville Police Department, if they were not already looking for her - - because they already knew her name - - they would be looking for her that night.  And they found her.
>
> . . . . [Stehle] worked at Crestwood.  Apparently, they pulled her out of surgery, carried her in to some room and scared her to death.

(*Id*. at 52).

The trial record shows Ferguson's reaction to Kempaner's decision to disclose Stehle, along additional evidence of what took place behind the scenes at trial.  On August 3, 1995, Ferguson filed a motion for the removal of Mr. Kempaner, a motion for mistrial, and a motion to withdraw.  (Vol. 7 at 966-67).  During a hearing in chambers, Ferguson accused police investigator Harry Renfroe of intimidating the witness.  (*Id*. at 968).  Ferguson stated, "I understand that Crestwood Hospital filed a complaint against [Renfroe] yesterday. . . .  The

42

witness called me last night.  Her whole story has changed.  She says she doesn't care if he lives

or dies because nobody cares what happens to her."  (*Id.*).

On the other hand, Assistant District Attorney Taylor asserted that Renfroe did not

intimidate Ms. Stehle, that a hospital supervisor filed the complaint because Renfroe would not

let the supervisor remain in the room while he was questioning Ms. Stehle, and that he (Taylor)

had spoken with Stehle, and that Stehle told him she did not know Wilson and could not

recognize his picture.  (*Id.* at 968-71).  "[S]he has no recollection of it and . . .  she did not want

to be involved in this."  (*Id.* at 970).

The trial court denied Ferguson's motions.  (*Id.* at 968-79).  However, the judge did

inform Ms. Ferguson that, in the event Ms. Stehle

> testifies contrary to what Ms. Ferguson says she told to her . . .  Rule 3.7 of the
> Rules of Professional Conduct deal with the situation of a lawyer testifying. . . . .
> In this case, . . . [i]f [Stehle] says something under oath that you contend is
> contrary to what she told you before trial and proper predicate is laid on cross-
> examination of her, then I think under the . . .  rule, because this matter has
> occurred during the course of trial, that it would be permissible for you to testify.
> I do not believe that your testimony would be prejudicial to your client.  Contrary
> to that, it would be beneficial to you.

(*Id.* at 975-76).

Stehle was then called as a witness, whereupon she testified that she recognized Ron

Smith as an individual who frequented the Fantasia club, but denied she knew or had ever met

Casey Wilson.  (Vol. 8 at 1031-32).[29]   Nevertheless, when asked, "Is it possible that there were

---

[29] However, the testimony of Smith, his family and two independent witnesses provided
more than adequate impeachment evidence of this aspect of Stehle's testimony at trial.  The two
independent witness were David Seagroves and Rodney Reliford.  Seagroves was the manager of
Fantasia nightclub, and testified that Stehle began dating Smith in the "spring of '94", that the
dating relationship "was common knowledge around the club"  that he was obsessed with her,
and that Smith had been removed from the club in August 1994 for several months for "jumping"

individuals that came in [Fastasia] that you had conversations with that you wouldn't remember seeing here in the courtroom, on the street, or anywhere else?", Stehle answered, "Absolutely." (*Id*. at 1035).  Stehle agreed that "[i]t was not impossible" that she may have met and talked to Casey Wilson at Fantasia.  (*Id*. at 1036).

Stehle denied having a relationship with Smith other than "[h]e was a regular customer and we spoke frequently.  That's it."  (*Id*. at 1033).  She did recall one incident at Fantasia "in early October" where a very intoxicated Smith threw a drink on her and called her a whore while she was talking to people at a pool table.  (*Id*. at 1036-37).  She denied knowing why Smith was angry, but agreed that it "could have" been because she had gone "to breakfast with another girl and two men[.]"  (*Id*. at 1037).

Ms. Ferguson did not ask to testify.  Thereafter, Ms. Stehle was dismissed as a witness.

After careful examination of the 2005 discovery of Smith's "factual predicate" and the record, this court concludes that Smith does not meet the statutory requirements of 28 U.S.C. § 2244(d)(1)(D) for several reasons.  First, it does not appear that Smith has discovered anything additional.  Moreover, it is readily apparent that such allegations could have been discovered and raised almost a decade earlier than the December 5, 2005, filing date of the amended petition in the habeas case.  Smith cannot show that the federal statute of limitations should be tolled under  § 2244(d)(1)(D).  With the exception of the investigative report, all of the information about

---

on a customer he believed Stehle was having "trouble" with "back in the pool room."   (Vol. 8. Tab. 12 at 1170-75, 1178-80).  Thereafter, Rodney Reliford, the door man at Fantasia, testified that Smith and Stehle "appeared as a couple after work.  If he wasn't down there, then he showed up after she got off work, and they left together."  (*Id*. at 1180-84).   Finally, Jennifer Walker, testified she knew Smith through a friend and that Stehle came by an apartment where Smith was located.  (*Id*. at 1188-93).

which he complains was well known and complained about at the trial.  Therefore, it is not new.

Smith never specifically alleges that Ms. Stehle told the investigators or the prosecutors that she

recognized Wilson as the gentlemen who broke up a fight between herself and Smith.  Nor does

he ever allege such information is contained in an investigative report, the contents of which

Smith never discussed.  Instead, he argues that Ms. Stehle now remembers Mr. Wilson when at

trial she testified she did not.  Smith has not detailed exactly what Ms. Stehle would state as to

what she told investigators (and which might be contained in any report), nor has Smith attached

an affidavit or supporting document from Ms. Stehle to any pleading in his petition.  Thus,

Smith's claim is procedurally defaulted.

### 2.  Equitable tolling – Actual Innocence

Smith next contends the "new" facts concerning Ms. Stehle also show he is actually

innocent of the capital offense and the death penalty punishment, both of which justify equitable

tolling of the statute of limitations.  (Doc. 17 at 18-19 (quoting *House v. Bell*, 547 U.S. 518, 536

(2006)).  Respondent counters that Smith's claim of actual innocence is not based on newly

discovered evidence, and falls far short of undermining confidence in the jury's determination.

(Doc. 19 at 2).

Unless Smith can show there is "a sufficient probability that . . . failure to review his

federal claim will result in a fundamental miscarriage of justice[,]" he cannot overcome his

procedurally defaulted claims.  *Edwards v. Carpenter*, 529 U.S. 446, 451 (2000).  Stated

differently, this exception allows a federal habeas court to consider a procedurally defaulted

claim in the absence of the usual cause and prejudice standard if a "fundamental miscarriage of

justice" has "probably resulted in the conviction of one who is actually innocent . . ."  *Schlup v.*

*Delo*, 513 U.S. 298, 323-27, n. 44 (1995) (quoting *Sawyer v. Whitley*, 505 U.S. 333, 335 (1992)).

*See also, Murray v. Carrier*, 477 U.S. 478, 496 (1986) (other citations omitted); *Melson*, 2008 WL 4891206 at *4).

Following the lead of the *Schlup* Court, the Eleventh Circuit examined the preliminary showing required for the actual innocence exception to be considered by the court, writing,

> As we held in *Wyzykowski v. Dep't of Corr.,* 226 F.3d 1213, 1218 (11th Cir. 2000), "[T]he factual issue of whether the petitioner can make a showing of actual innocence should be first addressed, before addressing the constitutional issue of whether the Suspension Clause requires such an exception for actual innocence." Following *Wyzykowski*, we decline to reach the merits of this issue because, even assuming that § 2244's limitations period could not be constitutionally applied to a prisoner who made a sufficient showing of actual innocence, Sibley failed to do so.

> There are two different ways in which person sentenced to death might be able to show "actual innocence " First, he might attempt to prove his innocence of the underlying capital offense itself. In *Schlup v. Delo*, 513 U.S. 298, 317, 115 S. Ct. 851, 862, 130 L. Ed. 2d 808 (1995), the Supreme Court held that a prisoner attempting to make such a showing must raise "new facts" that cast "sufficient doubt upon [his] guilt to undermine confidence in the result of a trial without the assurance that the trial was untainted by constitutional error." In practical terms, this means that the petitioner must show that " 'a constitutional violation has probably resulted in the conviction of one who is actually innocent.' To establish the requisite probability, the petitioner must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." *Id.* at 327, 115 S. Ct. at 867 (*quoting Murray v. Carrier*, 477 U.S. at 496, 106 S. Ct. at 2649).

> Either in addition, or as an alternative, to this a petitioner may attempt to demonstrate that, whether or not he is guilty of the capital offense, he is "innocent" of the death penalty because none of the aggravating factors legally necessary for invocation of the death penalty applied. [footnote omitted]. The Supreme Court has emphasized that, in making this determination, a court may not look to new evidence concerning mitigating factors; once it has satisfied itself that the minimum state law requirements concerning the presence of aggravating factors have been satisfied, its review is complete. *Sawyer v. Whitley*, 505 U.S. 333, 347, 112 S. Ct. 2514, 2524, 120 L. Ed. 2d 269 (1992) ("[T]he 'actual innocence' requirement must focus on those elements that render a defendant eligible for the death penalty, and not on additional mitigating evidence that was

> prevented from being introduced as a result of a claimed constitutional error.").
> To make this showing, a petitioner "must show by clear and convincing evidence
> that, but for a constitutional error, no reasonable juror would have found the
> petitioner eligible for the death penalty." *Id.*, 505 U.S. at 336, 112 S. Ct. at 2517.
> Thus, a petitioner challenging his underlying conviction faces a lower burden of
> proof than a petitioner challenging the existence of aggravating circumstances
> rendering him death-eligible.

*Sibley v. Culliver*, 377 F.3d at 1205-06.  The demanding standards of *Schlup* and *Sawyer* ensure

that "only the 'extraordinary' case will merit review of the procedurally barred claims." *Melson*,

2008 WL 4891206 at *4.

Having carefully examined the standards to be applied to actual innocence claims such as

Smith's, the court now reviews Smith's contention that he is actually innocent of capital murder

and the death penalty, and therefore should be allowed to proceed with his procedurally defaulted

*Brady/Giglio* claim.  The historical presence of Stehle as a witness in Smith's case has been well

examined.  Said information fails to meet the *Schlup* standard.  First, the evidence is not newly

discovered, and even if it were, it does not cast sufficient doubt upon Smith's guilt to undermine

confidence in the verdict in the sense that a reasonable juror would probably not have convicted

Smith of the capital offense if the evidence had been presented at trial.  Likewise, with regard to

the sentencing phase of trial, the evidence is not newly discovered, and even if it were, it does not

cast sufficient doubt upon Smith's culpability to undermine confidence in the trial court's

sentence in that the trial court probably would not have sentenced Smith to death if the evidence

had been presented to him.  Smith has not established sufficient actual innocence of the crime or

punishment to overcome his procedurally defaulted *Brady/Giglio* claims.

Even if Smith's vague and conclusory assertion of actual innocence is sufficient to

overcome the procedural default of his *Brady/Giglio* claims pertaining to the same subject, a

careful review of his habeas pleadings shows the claim is insufficient to establish a *Brady/Giglio*

violation.  In *Banks v. Dretke*, 540 U.S. 668, 670-72 (2004), the United States Supreme Court

explained the three essential elements of a *Brady* claim.

> A *Brady* prosecutorial misconduct claim has three essential elements.
> *Strickler v. Greene*, 527 U.S. 263, 281-282, 119 S.Ct. 1936, 144 L.Ed.2d 286. . . .
> [T]he evidence at issue [must] be favorable to the accused as exculpatory or
> impeaching . . . . the State suppressed the evidence at issue[,] [and the] suppressed
> evidence is "material" for *Brady* purposes.  *Ibid.*

*Banks v. Dretke*, 540 U.S. at 671.

> *Giglio* error, a species of *Brady* error, occurs when "the undisclosed
> evidence demonstrates that the prosecution's case included perjured testimony and
> that the prosecution knew, or should have known, of the perjury."  *Ventura v.
> Att'y Gen., Fla.*, 419 F.3d 1269, 1276-77 (11th Cir. 2005) (quoting *United States
> v. Agurs*, 427 U.S. 97, 103, 96 S. Ct. 2392, 49 L. Ed. 2d 342 (1976)).  In order to
> prevail under *Giglio*, Davis must establish that: (1) the prosecutor knowingly used
> perjured testimony or failed to correct what he subsequently learned was false
> testimony; and (2) such use was material-i.e., that there is "any reasonable
> likelihood" that the false testimony "could ... have affected the judgment."  *Giglio*,
> 405 U.S. at 154, 92 S. Ct. 763; *see also Tompkins v. Moore*, 193 F.3d 1327, 1339
> (11th Cir. 1999) . . . .

*Davis v. Terry*, 465 F.3d 1249, 1253 (11th Cir. 2006).

Again, Smith has failed to allege the prosecution did not disclose the information he

contends Stehle would now purportedly remember.  Nor has he alleged the prosecution was

aware of the information Stehle now purports to remember and failed to reveal it to the defense.

In fact, he never alleges Stehle gave false testimony on the stand or that Stehle admits she did so,

for whatever reason.  He certainly does not attach any affidavit or other reliable declaration from

Stehle that would connect the dots in his insufficiently pleaded *Brady/Giglio* claims.  Therefore,

Smith has failed to establish that a miscarriage of justice would occur if the procedurally

defaulted claims are not reviewed.

**III.     CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus filed by Ronald Bert

Smith is due to be denied and dismissed with prejudice.  An appropriate order will be entered

separately.

Done this 15th day of January 2009.


_____
L. SCOTT COOGLER
UNITED STATES DISTRICT JUDGE
153671

49